**S. AMANDA MARSHALL, OSB #95347**
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney
charles.gorder@usdoj.gov
**DAVID L. ATKINSON, OSB #75021**
Assistant United States Attorney
david.atkinson@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 717-1117
Attorney for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:10-CR-00506-KI |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| HOSSEIN LAHIJI, and NAJMEH VAHID, a.k.a. Najmeh Lahiji, | Sentencing Date: November 19, 2013, at 10:00 a.m. |
| Defendants. | |

The United States Attorney submits the following memorandum concerning the appropriate sentence in this matter.

## I.    INTRODUCTION

Having heard the jury trial in this matter, the Court is intimately familiar with the facts of this case.  The defendants were found guilty by the jury of a conspiracy to defraud both the Internal Revenue Service and the Office of Foreign Assets Control (Count One) and a conspiracy to transfer funds overseas to promote a violation of the Iranian embargo (Count Two).  In summary, defendants are a doctor/lawyer couple from Texas who transferred approximately $1.9

million through the Child Foundation to Iran.  The evidence at trial established that at least $1.5 million of that amount was used (1) to purchase a building in Tehran, Iran, using defendant Lahiji's sister as a straw buyer, (2) to invest approximately $700,000 in long-term deposit accounts (CDs) at the Karafarin Bank in Iran, (3) to pay substantial "religious taxes" or "khoms" on behalf of Ayatollah Makarem Shirazi in Iran, and (4) to provide salary and other financial resources to defendant Vahid's mother in Isfahan, Iran.  The ultimate disposition of most of the remaining balance (approximately $400,000) is unknown, but given the fact that that sum was not reported as revenue by the Child Foundation it is highly probable that Child Foundation acted as a "pass through" to Refah Kudak, thus precluding any charitable deduction for that amount.

By using the Child Foundation as the transfer vehicle for these personal investments and expenditures, the defendants were able to falsely claim large "charitable deductions" on their income tax.  The tax loss flowing from these inappropriate deductions, with interest through November 19, 2013, is $1,184,951.00.[1]

Both defendants had integral roles in these offenses and are equally culpable.  Based upon all of the facts and circumstances in this case, including the advisory guideline range and the factors to be considered under 18 U.S.C. § 3553(a), the government recommends that both defendants be sentenced to 30 months in custody, individually fined $250,000 on Count One and

---

[1]  The Presentence Reports ("PSRs") recommend a restitution figure of $1,178,566.00, which is based upon interest computed through September 4, 2013.  See PSRs, ¶ 30.  We have had the IRS recompute the figure with interest through the date of sentencing, that is, through November 19, 2013.  Attached as Exhibit "A" is a spreadsheet containing these up-to-date computations.

**GOVERNMENT'S SENTENCING MEMORANDUM** **Page 2**

$350,000 on Count Two, for a total of $600,000 each,[2] and ordered jointly and severally to pay restitution to the IRS in the amount of $1,184,951.00.  In light of the defendants' substantial liquid assets, these fines, the restitution, and the applicable fee assessments should be paid immediately.  Pursuant to 18 U.S.C. § 3572(g)(3), the defendants should be ordered not to transfer or dissipate their assets until such amounts have been paid.

The jury found that $600,000 was involved in the conspiracy to promote violations of the Iranian embargo as charged in Count Two and the Court issued preliminary orders of forfeiture in that amount which the defendants have already paid to the United States Marshal.  In order to complete the record, however, the Court should confirm the $600,000 forfeiture orally at sentencing and then indicate in its formal written judgment and commitment orders that the criminal forfeiture has been satisfied.

## II.    ADVISORY GUIDELINE RANGE

The Probation Office and the government concur that for both defendants the total offense level is 32, the Criminal History Category is I, and the advisory guideline range is 121-151 months in custody and a fine between $17,500 and $1.2 million.  We anticipate that the defendants will challenge this advisory guideline calculation on a number of grounds, all of which should be rejected.

### A.    Base Offense Level 26

The defendants have challenged the Probation Officer's calculation of the base offense level as 26.  They concede that the applicable base offense guideline in this case is found at USSG § 2S1.1, which in this case incorporates USSG § 2M5.1 because it is applicable to

---

[2] Although the PSRs recommend that the imposed fines be "joint and several," there is no provision in 18 U.S.C. §§ 3571-72 for joint and several liability for a criminal fine.  Each defendant should be solely responsible for his or her own fine.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 3**

evasions of the Iranian embargo.   The base offense level under USSG § 2M5.1 is 26, not 14, for two reasons.

First, a "national security control," that is, the Iranian embargo, was evaded.  When President Clinton imposed the embargo he declared a national emergency, stating that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."   Executive Order 12957, 60 Fed. Reg. 14615 (March 15, 1995).   The President's declaration settles the matter of whether the Iranian embargo is considered a national security control under USSG § 2M5.1. *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (holding that the President's declaration of an emergency is controlling on the question of national security control);  *United States v. Elashyi*, 554 F.3d 480, 508-09 (5th Cir. 2008) (accord).  *See also United States v. Hanna*, 661 F.3d 271, 293-94 (6th Cir. 2011).  Indeed, this Court so found in the related Child Foundation and Yasrebi prosecutions.

The base offense level is also 26 because the offense involved "a financial transaction with a country supporting international terrorism."  USSG § 2M5.1(a)(1).  Section 2M5.1 defines "a country supporting international terrorism" as "a country designated under section 6(j) of the Export Administration Act (50 U.S.C.App. 2405)."  USSG § 2M5.1, comment. (n.4).  "In support of U.S. foreign policy applicable to terrorism supporting countries, the EAR imposes anti-terrorism license requirements on exports and reexports to Iran pursuant to sections 6(j) and 6(a) of the Export Administration Act."  15 C.F.R. § 742.8(a)(3) (effective at all relevant times from 1997 through January 2009; "The Secretary of State has designated Iran as a country whose Government has repeatedly provided support for acts of international terrorism").

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 4**

**B.      Specific Offense Characteristics**

The defendants object to an enhancement for "sophisticated means" under U.S.S.G.

§2S.1.1(b)(3).  The defendants assert that their offense did not involve "sophisticated means"

because defendants relied on the Child Foundation to transfer their money to Iran and all

transfers to Iran normally involve the use of third parties.  It strains credulity to suggest that (1)

transferring funds on multiple occasions to make investments in Iran, (2) sending checks made

payable to a 501(c)(3) charity like Child Foundation in order to hide from the government the

true purpose of the checks, (3) taking inappropriate charitable deductions, (4) often back-dating

said checks, (5) routing the money through relatives located overseas, (6) purchasing foreign real

estate through the use of a "straw woman" (defendant Lahiji's sister), (7) opening up foreign

bank accounts in the name of Refah Kudak in which the defendants retained a controlling

interest, and (8) concealing the true nature of the ostensible charitable deductions form

accounting professionals, did not involve the use of "sophisticated means."  Application Note

5(A) provides some typical examples of such means, including the use of offshore financial

accounts and the layering of transactions, both of which elements are present here.

**C.      Role in the Offense**

Both defendants suggest that they are entitled to a downward adjustment in the offense

level for playing a minor or minimal role.  As noted earlier, both defendants had integral roles in

these offenses and both are equally culpable.  The evidence at trial established that defendant

Lahiji made the initial contact with co-conspirator Yasrebi.  Lahiji later recruited his sister to act

as a "straw woman" in the purchase of the office/house in Tehran, contacted Ayatollah Mazaheri

about investing in an Iranian bank, and primarily dealt with Refah Kudak officials regarding the

Karafarin bank accounts. Defendant Vahid took care of the domestic U.S. based financial activity, issued and signed all but one of the checks to Child Foundation, including backdating three of them, and dealt with the domestic accountants who she caused to prepare false tax returns on the defendants' behalf. She also kept track of the defendants' investments in Iran, prepared the infamous chart (Government Exhibit 81) in 2006 tracking the status of the couple's personal investments in Iran, and sent the chart to Yasrebi and co-conspirator Iranshahi in Iran. Neither defendant had a minimal or minor role.

### D.    Obstruction of Justice

The defendants both object to the recommended two-level enhancement for obstruction of justice under USSG § 3C1.1. In order to apply this adjustment the Court must find that the defendants' testimony at trial was false, material, and willful. There were numerous examples of materially false testimony by both defendants during the trial.

For example, both defendants Lahiji and Vahid falsely testified under oath that Government Exhibit 8, the note to Ayatollah Mazaheri requesting advice on investing in a bank in the Islamic Republic was not what it appeared on its face to be, that is, an inquiry from defendant Lahiji about the religious propriety of investing in the Karafarin CD account which paid 20% interest. Both provided incredible testimony that defendant Vahid's father forged and sent the note to Mazaheri without their knowledge. Left unexplained however, because there is no credible explanation, is why defendant Lahiji's father-in-law would not sign his own name to the inquiry if he drafted it and why defendants would retain the document if they were not "investing" in a bank.

The most critical and obvious example of obstructive behavior, however, is that both defendants falsely testified about when they became aware of the economic sanctions involving transfers of money to Iran and the existence of the Office of Foreign Assets Control ("OFAC") which administers those sanctions and strictly regulates sending money to Iran. Proof of defendants' knowledge of the sanctions was a critical and material issue in the case because the charges involved specific intent crimes for which the government had to prove willfulness. Both defendants adamantly denied while under oath any knowledge of these restrictions or even knowing of the existence of OFAC until either after the indictment in this case, or at least until July 2008 when the search warrants were executed. *See, e.g*., defendant Lahiji's testimony at Tr. Trscpt., 6/21/13 at 1986, 2012, 2039-40, and 2074; defendant Vahid's testimony at Tr. Trscpt., 6/24/2013 at 2150-51, 2154, and 2191. This testimony was false, material, and willful and requires a two-level enhancement for obstruction of justice under USSG § 3C1.1 for both defendants. The jury obviously did not believe their testimony on this point because, if it had, it would have acquitted them, at least on Count Two. Among the evidence supporting an obstruction enhancement on this material issue is the following:

1.      Padraic Paffen, an agent with Immigration and Customs Enforcement, spoke with both defendants on several occasions and advised them that they needed to consult with OFAC if they wanted to send money to Iran. For example, Agent Paffen testified that on December 10, 2003, he spoke to both defendants at their medical office to discuss the defendants' prior attempts to send or transport U.S. currency to Iran. At the conclusion of this conversation, defendant Lahiji told Agent Paffen that he was planning on traveling to Iran in a couple of months and wanted to take money back to his family. Agent Paffen advised both defendants that

they "needed to speak with someone at the Office of Foreign Assets Control, OFAC, under the Department of the Treasury, because there are restrictions on certain types of transactions with the government and people of Iran."  Tr. Trscpt., 6/13/13 at 401-02.

2.      Several months later, defendant Lahiji asked Agent Paffen about a "90-day period" in which people could send money to Iran for earthquake relief and Agent Paffen once again referred him to OFAC.  *Id.* at 403.

3.      On April 13, 2005, defendant Vahid appeared at Agent Paffen's office and during the course of their conversation told Agent Paffen that she and defendant Lahiji wanted to start a business in Iran.  Agent Paffen once again advised her "that she should first call OFAC."  *Id.* at 406.  Found in defendant Vahid's files was a fax, dated that same day which contained Paffen's business card.  On the back of the fax, the words "OFAC" and "Office of Foreign Assets Control" were written.  Govt. Ex. 179, at JAN2011SW_00871-00872;  Tr. Trscpt., 6/24/2013 at 2296-97.  The following day, defendant Vahid wire-transferred approximately $300,000, which she later told her accountants was for a construction business in Iran.  Govt. Exs. 105-01, 110.

4.      There were numerous other pieces of evidence which made it clear that the defendants were aware in general terms of the Iranian embargo and the need to get OFAC permission to engage in commercial financial transactions, such as the refusal of Lone Star Bank to wire transfer defendants' funds directly to Iran and the seizure of currency which they attempted to send to Iran via DHL packages.

/ / /

/ / /

/ / /

**GOVERNMENT'S SENTENCING MEMORANDUM**          **Page 8**

F.      **Acceptance of Responsibility**

Although neither defendant has formally objected to the recommendation of the Probation Officer that there be no reduction in offense level for acceptance of responsibility, the government concurs with the PSRs in that regard. Indeed, as noted in the Addendum to the PSRs, the defendants' counsel did not offer to make the defendants available for an interview in the three plus months between the end of the trial and the distribution of the draft presentence report. See Addendum to the PSRs, Defendants' Objections, regarding paragraph 54 of the *Lahiji* PSR and paragraph 52 of the *Vahid* PSR. The defendants then failed to show up for a scheduled interview after that date, *id*., and we understand from the Probation Officer that his offer to do the interviews over the phone was never accepted. There is no basis for any finding of acceptance of responsibility.

The facts of this case are analogous to those in *United States v. Nielsen*, 371 F.3d 574, 582-83 (9th Cir. 2004), where the court rejected defendant's assertion that he was entitled to reductions for acceptance of responsibility under USSG § 3E1.1. "Conspicuously absent from the record on appeal is any significant evidence that Nielsen accepted responsibility for his crime. 'Although a district court may not punish a defendant for failing to participate in fact-gathering at a presentence interview or for not pleading guilty, the defendant must carry the burden of demonstrating the acceptance of responsibility.'" *Id*. at 582, *citing United States v. Innie*, 7 F.3d 840, 848 (9th Cir.1993). "'To receive the two-point downward adjustment, a defendant must at least show contrition or remorse.'" *Id., citing United States v. Gallant*, 136 F.3d 1246, 1248 (9th Cir.1998). Here, defendants' conduct fails to meet this or any of the other

criteria suggested in the applications notes to USSG § 3E1.1 (with the possible exception of timely paying the forfeiture verdict). See USSG § 3E1.1, comment. n. 1(A)-(H).

### G.    Downward Departure

Nor is an actual downward departure from the total offense level warranted under the facts of this case. Application Note 2 of USSG § 2M5.1, provides guidance both for where to sentence within the guideline range or, in an "extreme" case, whether to depart upward or downward. Most of the listed factors such as the volume of commerce, the extent of planning and sophistication, and the existence of multiple occurrences actually suggest more serious treatment in this matter.

The thrust of the defendants' argument for a downward departure is that the impact on national security in this case was "non-existent" because everything was charitable and the defendants are innocent, which simply contradicts the jury's verdict. Significant investments in the Iranian economy such as real estate purchases, depositing large sums in Iranian banks with the express purpose of promoting job growth and entrepreneurship in Iran, supporting the causes of ruling ayatollahs, and building "mini cities" all lessened the effect of the President's embargo imposed upon Iran in an effort to influence its international behavior and the potential production of weapons of mass destruction, obviously a core national security interest.

## III.    GOVERNMENT'S SENTENCING RECOMMENDATIONS

The government has considered all of the facts and circumstances in this case, along with the various sentencing factors set forth in 18 U.S.C. § 3553(a). Our recommendation of a custodial sentence of 30 months, $600,000 in total fines, and an order of restitution to the IRS in the amount of $1,184,951.00 as to each defendant is explained further below:

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 10**

### A.    Custodial Sentences

In arriving at the recommendation of a custodial sentence of 30 months, we have considered a number of factors.  The defendants' motivation in engaging in this conduct was economic greed.  In that sense, this case resembles any number of other "white collar" criminal cases in which well-heeled, well-educated defendants have deliberately chosen to break the law in order to profit financially.  The fact that the defendants currently have in excess of $20 million in cash sitting in their bank accounts demonstrates how much they have accumulated since coming to the United States.  Although some of those funds may be derived from the alleged health care fraud for which they are currently facing trial in the Southern District of Texas, there is no question that defendants have profited from the economic opportunities available in this country, and done so to an extraordinary degree.

And yet $20 million was not enough.  Here, over a period of years, defendants made calculated decisions to transfer funds back to Iran, to invest them for their own benefit and for that of their family members, and to claim charitable deductions while so doing.  In effect, they crafted what amounts to illegal 401(k) retirement accounts.  The probationary sentences which the defendants seek would convert their decisions to commit their crimes into mere economic gambles.  "If we're caught, we just have to pay the money back, and maybe pay an additional fine."  A custodial sentence promotes deterrence by signalling to other businessmen and women thinking of cheating IRS and OFAC that the penalty, if caught, will not merely be financial.

We recognize that this is a somewhat unusual "Iranian Embargo case" in the sense that it does not involve the exportation to Iran of physical products such as sophisticated electronics with potential direct uses in Iran's defense industry.  Our recommended sentence of 30 months is

substantially below the advisory guideline range of 121-151 months. Indeed, our recommendation is even substantially below the advisory guideline range of 51-63 months which would apply if one were to view this matter as purely a tax fraud case,[3] and ignore the embargo violations.

The government's below-guideline recommendation accounts for mitigating factors, especially including the fact that the defendants have four minor children who need care and supervision into adulthood. For that reason, the government will not object to staggering the defendants' custodial sentences, allowing one defendant to serve his or her time while the other defendant cares for their children. Our recommendation also accounts for some comparison with the Court's 12-month sentence of Mehrdad Yasrebi. In contrast to defendants, in *Yasrebi,* the Court found that defendant did not operate with the same naked economic self-interest as did defendants. Yasrebi accepted some responsibility in this affair, actually pleaded guilty, and did not perjure himself at trial. And finally, we have taken note of the letters of support submitted by defense counsel testifying to some acts of charity by defendants.

Counsel has submitted to the Probation Office a compendium of certain prior sentences in export cases investigated by the Department of Commerce. Of course, all cases are factually different, including this one, and the compendium does not specifically identify cases with either the aggravating factors present here, such as use of sophisticated means and obstruction of justice, or with certain mitigating factors absent here, such as acceptance of responsibility and cooperation with the government against co-defendants or others. The charges brought, the number of separate violations which occurred, and the dollar value of items exported can all vary

---

[3] Under U.S.S.G § 2T1.1, the Offense Level would be 24, assuming a tax loss greater than $400,000, the use of sophisticated means, and an enhancement for obstruction of justice.

**GOVERNMENT'S SENTENCING MEMORANDUM**      **Page 12**

and lead to differing sentences.  The compendium does, however, include numerous custodial sentences equal to or longer than what the government recommends here.

Perhaps a more apt survey would consist of sentences in this District over the past 10-15 years for cases involving export violations.  For example, in *United States v. Manfred Felber*, 94-CR-60044-HO, a defendant who attempted to export chemical agent monitors to Iran received a 51-month sentence after pleading guilty.  In *United States v. George Cheng*, 97-CR-00412-MA, a case involving the export of military surplus scrap to China, the defendant who was convicted at trial was sentenced to 24 months.  In *United States v. Rashidian and Trojack,* 97-CR-00021-HA, a case involving a conspiracy to send impregnated alumina to Iran in violation of the embargo, one defendant with a criminal history (Trojack) who went to trial and perjured himself received an 84-month sentence, while the other defendant, who pleaded guilty and had no prior record, received a 24-month sentence.  Finally, in *United States v. Joe-Pin Ouyang, et al.,* 99-CR-00298-KI, a case involving a single attempt to send computer processor emulators to Iran, this Court sentenced the responsible corporate official, Ouyang, to 5 months after he pleaded guilty and testified at a co-defendant's trial.  The government's recommendation here fits well within the mainstream of sentencing practices in this District.

### B.    Fines

As noted in the PSRs, the fine range is $17,500 to $1.2 million, which provides the Court with maximum flexibility is fashioning an appropriate fine.  We are advised by IRS that if this case were treated as a *civil fraud* case, the fraud penalty to be collected would be $492,351.75, that is, 75% of the unpaid tax deficiency of $656,469.00 (a figure which does not include back interest).  This Court's fine in a criminal case should obviously be higher.  $600,000.00 falls in

the middle of the applicable advisory guideline fine range.  Thus, we recommend a $250,000 fine

on Count One (the maximum) and a $350,000 fine on Count Two, for a total of $600,000.00 as

to both defendants.  Based upon their current assets, they can afford it.  See *Vahid* PSR, ¶ 60;

*Lahiji* PSR ¶ 62.

## C.    Restitution

The PSR correctly calculates the amount of restitution.  Defendants argue that the jury's

forfeiture award of $600,000 limits the tax loss and that the proper amount of restitution payable

to the IRS would be only $210,000, assuming a 35% tax rate on the $600,000 forfeiture verdict.

The forfeiture verdict, however, merely reflects the amount involved in IEEPA-related money

laundering activity in violation of the Iran embargo, as alleged in the forfeiture count of the

indictment.  Defendants' argument ignores substantial record evidence demonstrating that

defendants defrauded the IRS in each of the tax years at issue in ways that were independent

from and unrelated to the embargo and the forfeiture verdict, and thus the total tax deficiency, as

set forth in both PSRs at paragraph 30, is $656,469.00.

Trial Exhibit 160 was a spreadsheet introduced through IRS Revenue Agent Rene

Hammett.  The exhibit is similar to Exhibit "A", except that it does not include the interest

figures appearing in Exhibit "A", nor the totals.  Ms. Hammett testified in detail about why most

of defendants' claimed deductions were inappropriate in each of the relevant tax years.  Her

testimony included the concept that ostensibly charitable donations used for a purpose that is

illegal or contrary to public policy – *i.e.,* an embargo violation -- are not properly deductible.  Tr.

trscpt., 6/19/13, p. 1473.  But she provided an independent basis, separate and apart from the

embargo violations, for concluding that each year's deductions were improper.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 14**

For example, Ms. Hammett testified in some detail that the 1998 deduction was improper because it was backdated as a part of the conspiracy with Child Foundation under which defendants would receive backdated receipts in return in order to deceive the IRS.  Tr. tscrpt., 6/19/13, pp. 1454-73.  Defendants' suggestion that this was merely "sloppy" is specious. Additionally, trial evidence established that the 1998 deduction was predicated on "Money of Dr. Lahiji Khoms and Zakat."  Govt. Ex. 59-01 (Yasrebi's check book register, referring to defendant Lahiji's funds received January 30, 1999).

The 1999 deduction included the purchase of the building in Tehran titled in defendant Lahiji's sister's name.  Child Foundation wired the funds for the purchase of the building not to the Iranian charity, but ultimately to defendant Lahiji's brother-in-law Badihi.  Ms. Hammett testified – and the court provided the jury with an instruction confirming – that it is improper to predicate a charitable deduction on a donation that accrues to the benefit of a family member. See Court Jury Instruction No. 19.  Indeed, defendants' new trial exhibit 7 represents that defendant Lahiji's sister "was the decision-maker" who would monitor the use of defendant Lahiji's building in Tehran, thus demonstrating that the Lahiji family, not the U.S. based charity, exercised control over this asset.  ECF 305-7.

Ms. Hammett testified that a donation to a U.S. charity is not deductible to the extent that the U.S. charity acts as a "pass through" to a foreign charity and does not control and direct the expenditure of the funds.  See Court Jury Instruction No. 19.  See also, Tr. tscrpt., 6/19/13, pp. 1474-85.  Her testimony further established that the donation of less than a complete interest in property – *i.e.*, the right to use real property rent free – is not deductible.  This, too, was the subject of a jury instruction.  *Id.*

**GOVERNMENT'S SENTENCING MEMORANDUM**          **Page 15**

The 2000 deduction of $400,000 is the sole deduction for which Ms. Hammett did not have specific testimony independent of the embargo violations as a predicate for non-deductibility. However, she testified that this sum was not even reported as revenue by the Child Foundation on its informational IRS return. Thus, it is highly probable that Child Foundation acted as a "pass through" to the foreign charity and failed to control the expenditure of those funds in Iran, as explained above. Tr. tscrpt., 6/19/13, pp. 1486-94.

The 2001 deduction involved the carryover of a 2000 payment of "khoms" to Ayatollah Shirazi. Shirazi, who was decidedly not an IRS-approved 501(c)(3) charity, controlled the ultimate disposal of these funds, not the U.S. charity Child Foundation as required. Tr. trscpt., 6/19/13, pp. 1495-1500. Fugitive co-defendant Iranshahi inadvertently corroborated the information introduced by the government that the defendants "khoms" funds were divided 50/50 as directed by Ayatollah Shirazi, thus further establishing the non-deductible nature of the defendants' payments. See, Def. Mot. for New Trial, ECF No. 305, Ex 9, ¶¶ 19-20.

The 2002 deduction was both backdated, and involved the creation of the interest-bearing investment account at Bank Karafarin. Like the 2002 deduction, the 2003 deduction also involved the funds placed with Bank Karafarin. By all accounts – even defendants' expert -- the terms of the Karafarin investment represented an embargo violation because the account was created expressly to benefit entrepreneurship or the creation of employment opportunities in Iran. Both the government's expert, Andrew Sens, and the defendants' expert, Steven Pinter, agreed that such a transaction required a license from OFAC, which defendants never obtained. Tr. trscpt. 6/14/13, p. 613, and 6/21/13, p. 1955. Because the account was both unlawful and contrary to public policy, the deductions occasioned by its creation were inappropriate.

**GOVERNMENT'S SENTENCING MEMORANDUM**                **Page 16**

Defendants' trial exhibit 663A ("minutes of understanding" purporting to establish the Karafarin account) demonstrates on its face that the account was established by a direct agreement between defendant Lahiji and the principals of the foreign charity, Refah Kudak. Child Foundation was not a signatory to nor did it have anything to do with the agreement other than to serve as a pass-through. As explained above, this sum was not properly deductible because the U.S. based charity did not control the funds. Tr. trscpt., 6/19/13, pp. 1501-07. By way of further example, exhibit 1 appended to defendants' Motion for New Trial (at ¶ 3.3, p. 4, ECF No. 305-1) represents that monies from the Karafarin bank account were disbursed "by the order of" defendant Lahiji in June 2008. There is no question that defendants controlled the funds, not Child Foundation USA, as required for the deduction to have been appropriate.

Finally, the 2005 deduction was both backdated and involved funds used to satisfy defendants' "khoms" obligation through Ayatollah Shirazi. See, Tr. Ex. 119 (internal Child Foundation email clearly establishing that the check conveying funds from defendants was backdated); Tr. trscpt., 6/19/13, pp. 1507-12.

Ms. Hammett also calculated the interest on the various tax deficiencies which total $656,469.00, for each of the relevant years based upon the provisions of the Internal Revenue Code providing for the payment of interest and the method by which it is compounded. *See* 26 U.S.C. §§ 6601, 6621 and 6622 (requiring the assessment of interest on tax underpayment amounts; providing for interest benchmarks and daily compounding). We understand defendants to argue that interest is not legally appropriate, not that the interest set forth in Exhibit A was miscalculated under the applicable IRS benchmarks.

**GOVERNMENT'S SENTENCING MEMORANDUM**          **Page 17**

The court is authorized to include interest as part of the restitution. Ninth Circuit precedent authorizes the inclusion of pre-judgment interest as part of the restitution. The IRS can recover interest on unpaid taxes through restitution when the defendant is convicted under, among other statutes, 18 U.S.C. § 371. The Mandatory Victims Restitution Act (MVRA) allows the court to order restitution to any victim of any offense listed in title 18 U.S. Code, including convictions under 18 U.S.C. § 371. 18 U.S.C. 3663(a)(1)(A); *U.S. v. Meredith*, 685 F.3d 814, 827 (9th Cir. 2012) (The MVRA "*does* apply [to] Section 371 conspiracy offenses." (emphasis in original)). A victim under the MVRA is a person or entity that is "directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663(a)(2).

In crafting the restitution order, "the court shall order restitution to each victim in the full amount of each victim's losses. . . ." 18 U.S.C. § 3664(f)(1)(A). That the United States may be a "victim" entitled to restitution is beyond question. See, 18 U.S.C. § 3664(i) (where United States is victim, all other victims must receive full restitution before funds are disbursed to the United States). The IRS is the victim in cases of conspiracy to defraud the IRS under 18 U.S.C. § 371. *See Meredith*, 685 F.3d at 826–27 (approving payment of restitution to IRS, while vacating restitution order because the amount was improperly calculated).

The purpose of restitution is to make the victim whole as if the crime had never happened. Including interest in the restitution order is necessary to compensate the victim for the full amount of the victim's loss. Interest is properly included in the restitution order because it represents the victim's lost opportunity to use the money or to obtain the interest. The Ninth Circuit first addressed the issue of interest being included in restitution in construing the Victim

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 18**

Witness Protection Act in *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991), stating that

"foregone interest is one aspect of the victim's actual loss." The Ninth Circuit has applied that

same reasoning to restitution under the MVRA. "Prejudgment interest reflects the victim's loss

due to his inability to use the money for a *productive* purpose, and is therefore necessary to make

the victim whole." *United States v. Gordon*, 363 F.3d 1044, 1059 (9th Cir. 2004) (emphasis in

original) quoting *United States v. Patty*, 992 F.2d 1045, 1050 (10th Cir. 1990). "[I]nterest is

simply a proxy for a 'lost opportunity.'" *Id.*, citing *Government of Virgin Islands v. Davis*, 43

F.3d 41, 47 (3d Cir. 1994) ("Lost interest translates into lost opportunities, as it reflects the

victim's inability to use his or her money for a productive purpose.").

In this case the United States through the IRS has lost the opportunity to make use of the

money that would have been due had the defendants not committed the fraud. Accordingly the

IRS is entitled to receive restitution for both the amount of the loss as well as interest for the lost

money. *See, e.g. United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013 ("district court did not

abuse its discretion by including interest in a restitution order intended to compensate the IRS as

a victim for the full amount of its losses from Perry's evasion of income taxes") (citing *United

States v. Ellefsen*, 655 F.3d 769, 782 (8th Cir.2011) (affirming a restitution award to the IRS that

included interest); *United States v Hassebrock*, 663 F.3d 906, 926 (7th Cir. 2011) (same);

*United States v. Qurashi*, 634 F.3d 699, 703–04 (2d Cir.2011) (affirming restitution award of

prejudgment interest under MVRA; collecting cases from Third, Fourth, Fifth, Seventh, Ninth

and Tenth Circuits).

/ / /

/ / /

**GOVERNMENT'S SENTENCING MEMORANDUM**                **Page 19**

## IV.    CONCLUSION

For the reasons given above and in the Presentence Report, the government recommends a sentence of 30 months as to each defendant, three years of supervised release, separate fines in the amount of $250,000.00 on Count One and an additional $350,000 on Count Two as to each defendant, an order of restitution to the IRS in the amount of $1,184,951.00 for which the defendants should be jointly and severally liable, and a total of $200 fee assessments as to each. Pursuant to 18 U.S.C. § 3572(g)(3), the defendants should be ordered not to transfer or dissipate their assets until such amounts have been paid. The Court should also confirm the $600,000 forfeiture orally at the hearing and indicate in its formal written judgment and commitment orders that the criminal forfeiture has been satisfied.

Dated this 13th day of November, 2013.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*/s/ David L. Atkinson*
**DAVID L. ATKINSON, OSB #75021**
Assistant United States Attorney

*/s/ Charles F. Gorder, Jr.*
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney